Afternoon, may I please the court change the spell on behalf of the appellant Marie Difiore. I'd like to reserve five minutes for rebuttal. You have it. In 2001 in the Hutchins case, this court first construed the standard, the causation standard in 3730 H1 and 2. Nassar has placed that in question. Yes, Your Honor, that's what I intend to address. In 2001 in reaching that standard, the court visited the Senate report in two regards. One, in assessing the context in which 3730 H1 and 2 had been reached and also in setting the causation standard itself. Don't we have difficulty getting to legislative history unless we find that there's ambiguity in the statute? And post-Nassar, are we really going to say that because of is an ambiguous phrase? In the first instance, Your Honor, I'm not sure whether the court did that analysis back in 2001. I'm not sure on what grounds the court determined that it should review the legislative history then. Although, with respect to that, one would suggest that having reviewed the legislative history in the first instance in construing this, that you might do it again at this instance. With respect to the ambiguity. So if we made error there, we would just repeat it? We shouldn't have done it then. In that Hutchins case, I know you argue that we decided the standard, but in fact, in Hutchins, we really decided that there was no protected activity. Correct? That is correct. What was the holding in Hutchins? The holding in Hutchins was that there had been... I'm sorry, Your Honor, I'm not sure I understood the question. The holding, what was the holding? What does Hutchins stand for? Hutchins stood for the... I'm sorry, Your Honor, I'm not sure that I have the correct answer for the question. All right. With respect to the ambiguity that Your Honor raises, we believe that the statute is ambiguous on its face for the reason that it contains three separate wordings for a causation standard. One, in H1, it contains the language because of that would mirror that in Title VII in the ADEA in 2000 E2 and Section 623. The issue, however, is that while it uses because of in that particular section, H1, in H2, it refers to but for causation. But that's really a measure of reinstatement with status that would have had but for discrimination. That's a different subject. It's not really a causation standard. It's a measure of the reinstatement right. Yes, Your Honor, we see H2 as a measurement of damages with two subparts. One, the measure of damages with respect to compensatory damages, and one with respect to special damages using the language result of and also the language but for. Here in a single section, H, Congress has used three separate causation standard wordings. And having used the words but for and result of in the H2, we believe that it's evidence that Congress knew how to say but for when it was their intention. Plus, in light of the fact that we have the Senate report saying exactly what it was that because of meant, we really do believe that in the context, it makes sense to treat that statute as ambiguous. If you're right, if we were to say, well, we'll look at the legislative history. And obviously, there's a wrong instruction. So there's a grand new trial. Then we get to the constructive discharge issue, do we not? Because if it were to go back, we need to decide whether that was properly disallowed or correct. Yes, Your Honor. What's the standard that you would advocate for constructive discharge? We would advocate that the conditions have to be so unpleasant or difficult. So intolerable that a reasonable person would feel compelled to resign. And how do we get there in this case? We never have a situation where she says, listen, you're making this difficult for me. I may, you know, have to resign or, you know, we don't have a lot of protestation by her, which seems to be what we've looked at in Clouse and some of the other cases. Your Honor, in response to being placed upon the PIP, my client specifically raised the issue with the individuals giving her the PIP and said, we all know what this is. We all know that there's no way for me to come out of this. She, you know, was specifically asking, although unfortunately not as directly as counsel would wish, she was specifically asking whether or not this PIP was the same tantamount to her being terminated or to the fact that she would be terminated. What was so intolerable for her to play out the screen, for her to run through the PIP, and if her prediction was correct, well, then she's still in her claim? Well, at that point, Your Honor, I believe that she thought, and certainly from an objective standard, it would appear that it would have been futile for her to have stayed. This occurs against a backdrop of a year or more. So should that be the test, that there has to be a showing of futility in complying with the PIP to justify, to have the voluntary departure constitute a constructive discharge? I believe that, and I believe it was this court, Your Honor, in Souters, reached the conclusion that there is no quasi-exhaustive requirement with respect to constructive discharge. And thus, I would say that having raised this issue of whether or not she would be terminated, and then following that, having raised the issue of whether or not an amicable separation was possible, and no one suggesting to her, you don't need an amicable separation, we're not getting ready to fire you. And in the brief, we've cited a series of cases where... Well, there was going to be a meeting to discuss that, but when it was canceled, she resigned. So she never really had that one-on-one to have them say that. Although it was not in the contemplation of the appellant at the time, what we learned subsequently was that her instinct that this was a forced termination was borne out by the evidence. Behind the scenes, the HR folks and the compliance folks were exchanging correspondence that said, we have a letter. It was their expectation that this particular series of events, having gone ahead and given her this performance improvement plan, having gone ahead and taking her from the top of performance standards to all of a sudden giving her needs improvement and suggesting that she was at the bottom, just months after her stellar performance had resulted in her promotion from assistant director to director, that these things all together would result in her resigning. And we've also cited a case in the briefing regarding that, which is where an employer recognizes that their actions are going to result in a resignation, that we should treat that, one, as one of the close factors, but two, as something which might independently be enough to satisfy the so intolerable standard. If there are no more questions from the panel, I believe I've said what? Okay, very well. Thank you. Good afternoon. May it please the court. David Fryman, Ballard Spar for the appellate CSL hearing. Good afternoon, Mr. Fryman. Good afternoon, Judge. Your Honor, starting with constructive discharge, if I may, I recognize at the outset perhaps a bit of a paradox when it comes to a view of constructive discharge on summary judgment. It is necessarily a fact-specific inquiry, but at the same time it's one that is highly appropriate for summary judgment, an inquiry that courts can, in fact, must undertake for sound policy reasons, in fact, those sound type of policy reasons that this court articulated in Klaus, that we cannot allow an employer's insistence on high standards to be taken over by an employee's subjective view of that type of criticism of their performance. Although we don't have a subjective view of exactly what happened here in terms of her having been promoted and then shortly thereafter she gets reprimanded. She is told to look at things, you know, in a gray area. She's getting a lot of feedback that says she's not, you know, kind of a team player. And I'm just wondering whether this is the kind of situation where a jury should really perceive these people. You know, having been a trial judge, you know, if Ms. DeFiore came off credibly and her, you know, supervisor did not versus she comes off not credibly, the supervisor does, these things can really flex a lot in front of a jury. And I'm just wondering whether that should have happened here. I submit it should not have. Intolerable is, there is a lot of gray there. And what's intolerable to one person might not seem intolerable to another. I just wonder whether we judges should be deciding that as compared to reasonable people. Well, you know, I believe that this court and the Pennsylvania courts in the case of wrongful discharge have held that courts should make that inquiry in the first place, that we are going to take it out of Ms. DeFiore's lens and we're going to look at it objectively. How does she not satisfy the Klaus factors? Well, when you look at the very facts of Klaus, you see facts that strike up, that line up almost identically. We have a manager that's hypercritical of plaintiff's performance. We have warnings that performance will be actively monitored and assessed. We have a statement that if you fail to improve, disciplinary action will result. And then we have the lack of exploring alternatives before coming to the conclusion that resignation is the only option. Again, we need to come back to we have these close factors. But there we reversed the jury finding in Klaus. Yes, exactly. It's really kind of extreme. Pretty extraordinary. But I think it goes to show that it's not just an identification of factors, but a review of the context and recognition that there needs to be this very high bar. In fact, even in the context of a hostile work environment claim, that a, quote, garden variety hostile work environment, if such a thing exists, even that is not sufficient. That there needs to be a further egregiousness to a hostile work environment before an employee can resign and claim constructive discharge. This issue, if I may address, the threat of termination. If anything here, we have this factor pointing us in the other direction because counsel Ms. DeFiori emphasized the fact that there were, quote, threats of termination here, that there were multiple threats of termination. Well, in fact, here you had a warning, and it had what employers often typically include in a warning. And after going through, telling you what it is you've done wrong, you should understand that your failure to improve or if you were to do this again may result in further disciplinary action up to and including termination. Well, what happened? There was another incident after this first written warning. Was Ms. DeFiori, her employment terminated at that point? No. So there was then a second incident, another warning. Failure to improve or engaging in this conduct again will lead to disciplinary action up to and including termination of employment. Now we have a third situation. She's not heeding the warnings, the counseling that are given to her about her performance. Did they jump the termination of employment? No. Yet again, they do something to give some form of workplace due process. They put her on a performance improvement plan. So why is it that now? Which the record shows has been largely a dead end for anybody who's put into that. And that's right, Judge. So now the message that you would send to an employer is that you don't give it a final, hey, you're not getting the message here when I'm meeting with you every week. This is really serious. What you're saying is, why should we bother doing that? Because if we do that, an employee can just throw up their hands, walk out the door and say, you fired me. And in fact, the record evidence is that there were others who were placed on performance improvement plans and their employment wasn't terminated. So it would be entirely speculative. There's nothing on this record that would reflect that it was reasonable for Ms. DeFiori to assume, without even spending two days, let alone two hours, trying to comply with this performance improvement plan, that some 45 days later she would be terminated, that she had no option, that she was effectively forced, compelled under the circumstances to resign. There was no evidence of any hostile work environment. What is in the record regarding the likelihood that the PIP could end favorably? There was evidence in the record, and again, this is evidence that was procured in discovery. There was no evidence in the record that Ms. DeFiori was aware of these statistics, as to how many people were put on PIPs, what her knowledge was of other people put on PIPs. But if you go based simply on the data that was produced during discovery, sure, the majority either resigned rather than played out. Some didn't survive, but then there were a handful who did complete it successfully. So to say that it's a con being presented, it's a fait accompli, on an objective basis, I would maintain really isn't fair, and in fact is contrary to Klaus. And it's also contrary to when you look at the other cases. For example, Judge Randell, your opinion in Strempel, which is a Third Circuit opinion, where my recollection is correct, involved a surgeon or a physician with the VA. There you had things like being moved to a remote facility, being urged to retire, having his office moved floors away from the operating room, being subject to ageist comments. Here, even with respect to the alleged protected activity, you have no evidence that there was anything that she was being encouraged to do anywhere near the time that she made the decision to resign. The so-called illegal forecast, which is no evidence that there was anything illegal about them, the last time she was asked to do that was the first time she said, you know what, I'm really not comfortable doing it this way. And what was the response of CSL Bearing? It wasn't, no, our way or the highway. It says, hmm, oh, you think you want to do it that way? Okay, we can do it that way. Let's talk about the causation standard and whether it was proper for the district judge to instruct her on the but-for standard in light of Hutchins. Why isn't Hutchins controlling? Hutchins is not controlling because of Gross, Nassar, Burge, and in fact, and we appreciate this group bringing it to our attention, Egan reinforces what Gross and Nassar teach, and that is when you use because of, that is equivalent to but-for. And in fact, with respect to Congress and their intent, Congress in Title VII's prohibited discrimination provision, contrary to its anti-retaliation provision, used different language, and that's different language gives rise to a mixed motive or a motivating factor type of standard. But in every statute that the Supreme Court has come across, the ADEA in Gross, Title VII anti-retaliation in Nassar, and in fact, even in other contexts too, and there's no basis to distinguish statutes based on the nature of the subject matter. We then have Burge, which we've cited in our briefs, involving the Controlled Substances Act, where the Supreme Court, again, said when we have clear language in a statute where we have an intent tied to result, to use Judge Schwartz's language in the Egan case, that results in but-for. In fact, in Burge, there was citation back to Nassar. This was a case involving a drug statute where the Supreme Court went back to Title VII's anti-retaliation provision and said when we have this type of language, there can be an ambiguity. I asked Mr. Bell about the holding in Hutchins. It really wasn't the holding that there was no protected activity? I believe that's correct, Judge, and in fact, many of the cases that Plaintiffs' Counsel cites with respect to Hutchins, citation to Hutchins even post-Nassar is simply kind of a reflexive citation and where they're, for example, on motions to dismiss, where there's a finding that there's a lack of protected activity. But they really don't, as Judge McHugh found below, really address or grapple with the language and the causation. If we read Hutchins contrary to that, if we read Hutchins to say that the language under the False Claims Act called for the motivating factor instruction and the motivating factor form of causation, are Gross and Nassar sufficiently analogous for us as a panel to override a prior panel? I think so, Judge, because I think that Gross and Nassar hit it on the head and I think, in fact, this Court recognized that. They really only talk about a mode of analysis. They don't talk about the False Claims Act. No, they don't talk about the False Claims Act, but they talk about the use of because of in the statute and, in fact, when you look at Nassar and you look at the Title VII prohibited discrimination provision versus the anti-retaliation provision and then you look at this Court's decision in Egan where it is looking at a FMLA retaliation provision. I put retaliation in air quotes there because, in fact, the panel in Egan said, you know what, it's really not clear here that this is, in fact, a retaliation provision. We need to grapple with that. Whereas in the False Claims Act, if you look at the language of 3730H, it couldn't be any more clear that, in fact, this is prohibiting retaliation, that any employee shall be entitled to all relief necessary to make that employee whole if that employee is discharged because of effectively engaging in protected activity. It would be kind of clumsy to reword it the way the anti-retaliation principle is in Title VII. Race, color, religion, sex, or natural origin was a motivating factor. That's a factor. Whereas we'd say the lawful acts were, was the motivating factor. It doesn't read as easily. And yet we have legislative history saying it's among other things. Why can't we credit that and say, you know, obviously Congress did not act and enact with Nassar in mind. It hadn't been decided. It used the word because of because that was an easy way of framing and phrasing it. But we're not saying that they meant to exclude any other factor that might have been there. Judge, I think that would be, you know, going somewhere that this court under. Well, let the Supremes decide. See if they meant what they said in Nassar or whether they say, wait a minute, we really don't think that this is supposed to be that exclusive. But I don't think Nassar stands out there as some outlier because you also have gross. You also have barrage that all reflect that when because of is used, notwithstanding what it may have said in legislative history, Congress made that conscious choice. And it knew how to, just as if it could have made it mean clumsy, it could have worked to make that language just like it did and make those distinctions like it did in Title VII. Unless the panel has any further questions. No. Thank you. Thank you, judges. Mr. Duff. Thank you, Your Honor. One of the things that made it so intolerable from our client that we didn't discuss with respect to potentially the Klaus factors or at least to the intolerability was the fact that she had been asked to engage in various forms of illegal activity that she was no longer willing to proceed with. Well, we don't have much that says, okay, this was illegal, and here's where it says in the law that this isn't permitted. She makes a reference to the fact that she's not the judge, but she's asking these questions. What do we have to say that any of this was necessarily, you know, unlawful as a matter of law? Well, I suppose, Your Honor, that we don't know that with specificity, although we do need to have that as specificity, don't we? If you say she's being made to do illegal things, you've got to tell us which things are illegal under what statute. Well, we believe that they were illegal under the False Claims Act, Your Honor, and that, of course, is the basis for the False Claims Act retaliation, which was that she was standing up for what she believed to be protection. No, they can't be illegal under the False Claims Act. They're illegal because the law says they asked me to write this on a prescription, and that's not allowed by U.S. Code. You know, that's what you have to show us, don't you? Well, I'm not sure, Your Honor. I had belief that the fact that... I think in Caldwell, he said that the belief that something's an illegal act isn't enough. It has to have been an illegal act. I suppose, Your Honor, that had there been a key tam, then we would know the answer to that, but there was not. Okay. Drew? With respect to this idea that Egan is of a factor that Nassar or Gross overruled this, I think it's worth looking at Gross itself and the point that was made that in construing 623 that it did not necessarily make sense to import the language or the traditions from a different statute, in that case, Title VII, although up until that point the Supreme Court had construed Title VII and the ADEA as being nearly the same because, of course, that the 623 was pro hoc, thereabout. I'm not sure that's how you say it, but it was identical language to Title VII, but then, of course, they were construed differently. I think it makes sense here to similarly say that because these two statutes have been construed in part, Title VII in part and the ADEA in totality as reaching a certain level of causation because of language, that it doesn't necessarily make sense to import it into a federal whistleblower statute. I mean, Congress itself in the section that was read in the 2001 and would suggest should be read again identified that the whistleblower statutes were different and that it was relying in part on seven or eight other whistleblower statutes that had been reached in the past in the way that they had been construed. The court also took note in terms of the context of the fact that federal whistleblower statutes are important for a different reason because this is not a single plaintiff going up against a single employer and this is not a criminal case in which we're looking at a sentencing enhancement where the rule of law ought to apply. This is the trying to create the world in which the individual feels that they are comfortable coming forward and exposing government what's a crime or a fraud against the government and acknowledges that in the absence of really strong retaliation protection that people will not take that step. People will not do this. It's looked since 1986, Your Honor, the tens of billions of dollars have been recovered since the enactment of this particular anti-retaliation provision. So whistleblower statutes we would submit are entirely different from the statutes that Because Of has been interpreted in. Neither in Egan nor in Nassar or Gross is there any indication that the formulation X Because Of Y is always to be read as requiring but-for causation. With respect to the standard, what we're really fighting about is not as stark as it would seem because in no sense is either standard a solely because of standard. Really the difference between the two standards only occurs at equipoise which is the question of whether or not where the evidence is 50-50 who's going to win and under the, at least in part of standard, who's going to win will be the plaintiff but under the other standard who's going to win will be the defendant. The only other really strong aspect in terms of this with the possibility of the confusion of the jury is the burden of persuasion and the way that that may impact how this falls. But in the abstract, the only real difference between these two standards is what happens at equipoise. Anything else, Mike? I'm good. Thank you very much, Mr. Bell. We'll take the matter under advisory.